62 Mass. App. Ct. 567 (2004)                                    567

Heineken U.S.A., Inc. *v.* Alcoholic Beverages Control Commission.

Heineken U.S.A., Inc. *vs.* Alcoholic Beverages Control
Commission & another.[1]

No. 03-P-178.

Suffolk. March 11, 2004. - November 29, 2004.

Present: Duffly, Mills, & Green, JJ.

*Alcoholic Liquors,* Alcoholic Beverages Control Commission, Supplier,
Wholesaler. *Administrative Law,* Judicial review. *Notice. Statute,*
Construction.

Statement of the standard of review utilized by this court in an appeal of a
decision of the Alcoholic Beverages Control Commission. [571-572]
Substantial evidence supported the conclusions of the Alcoholic Beverages
Control Commission (commission) that a supplier of alcoholic beverages
had insufficient information on which to conclude, rationally and fairly,
that a third party had ceased to operate as a licensed wholesaler, and that
the supplier was therefore required to give written notice, as provided by
G. L. c. 138, § 25E, prior to discontinuing sales to that wholesaler
[572-575]; however, there was nothing in the record to support the com-
mission's conclusion that a later written notice sent by the supplier to the
wholesaler was an attempt to circumvent the requirements of the statute,
and this court remanded the matter to the commission for a determination
whether the supplier had good cause under § 25E to discontinue sales as
of that later date [575-578].

Civil action commenced in the Superior Court Department on
January 25, 2001.

The case was heard by *Patrick F. Brady,* J., on a motion for
judgment on the pleadings.

*Evan T. Lawson* for Fahey Beverage Company, Inc.

*Sheila L. York,* Assistant Attorney General, for Alcoholic
Beverages Control Commission.

*Louis A. Cassis* for the plaintiff.

Duffly, J. We consider whether a supplier of alcoholic bever-
ages may terminate sales to a wholesaler, who appears to have

[1]Fahey Beverage Company, Inc.

gone out of business, without giving "notice of discontinuance of sale," as provided by G. L. c. 138, § 25E.[2] After hearing, the Alcoholic Beverages Control Commission (commission) determined that Heineken U.S.A., Inc. (Heineken), had violated the provisions of § 25E when it discontinued the distribution of its brand items to Fahey Beverage Company, Inc. (Fahey), in May, 1999, without giving the statutorily required notice. Because the commission found that Heineken's November 17, 1999, notice failed to "cure the prior lack of notice," the commission did not reach Heineken's claim, as set forth in that notice, that there existed a "good cause" basis to discontinue sales to Fahey.

Heineken sought review in Superior Court, see G. L. c. 30A, § 14, where a judge set aside the decision, concluding that Fahey was not entitled to advance notice of discontinuance because Fahey was out of business at the time Heineken stopped shipping. The judgment also dismissed Fahey's G. L. c. 93A counterclaim, on the ground that it was based on the asserted violation of c. 138, § 25E. See note 2, *supra*. The commission and Fahey filed this appeal.

*Background facts.* We draw our summary of the facts from the parties' stipulations and agreed-upon exhibits submitted to the commission at the May 2, 2000, hearing, as well as from the commission's findings.[3]

Heineken is an out-of-state supplier authorized by G. L.

---

[2]The first paragraph of G. L. c. 138, § 25E (as appearing in St. 1982, c. 627, § 10), makes it an unfair trade practice "for any . . . importer [i.e., supplier] . . . of any alcoholic beverages, to refuse to sell, except for good cause shown, any item having a brand name to any licensed wholesaler to whom such . . . [supplier] . . . has made regular sales of such brand item during a period of six months preceding any refusal to sell." The second paragraph of § 25E requires the supplier to provide the wholesaler with at least 120 days' notice of its intention to discontinue sales. G. L. c. 138, § 25E.

[3]Our review is necessarily confined to that which was before the commission. See G. L. c. 30A, § 14(5); *She Enterprises, Inc.* v. *State Bldg. Code Appeals Bd.*, 20 Mass. App. Ct. 271, 273 (1985). We therefore give no special weight to the views of the Superior Court judge who decided the matter on the parties' cross motions for judgment on the pleadings. See *Southern Worcester County Regional Vocational Sch. Dist.* v. *Labor Relations Commn.*, 377 Mass. 897, 903 (1979). See also Superior Court Standing Order 1-96, as amended (1999).

c. 138, § 18B, to sell alcoholic beverages to licensed Massachusetts wholesalers. For several years prior to its attempt to discontinue sales in May, 1999, Heineken had sold its brand name products to Fahey, a small Massachusetts wholesaler licensed under G. L. c. 138, § 18. Fahey is a closely-held corporation with a sole place of business in Pittsfield, and William Larkin is its president, treasurer, and general manager.

By 1999, Larkin, who had inherited Fahey from his father in 1957, had decided to get out of the beer business. The population of Fahey's Berkshire County distribution area was declining, his suppliers were seeking new contracts that would have required expansion, and his children were not interested in pursuing the beer business. Richard Placek, the president of Commercial Distributing Company, Inc. (Commercial), and Larkin's good friend, offered to buy the business and Larkin agreed. Commercial, like Fahey, holds a Massachusetts wholesaler's license; its Westfield operation distributes to several counties in western Massachusetts, and was larger than Fahey's.

In March, 1999, working with their attorneys and accountants, Larkin and Placek negotiated an asset purchase and sale agreement pursuant to which Commercial agreed to buy essentially all of Fahey's intangible assets, including Fahey's twenty distributor agreements, as well as certain of its tangible assets. Fahey's real estate (a building housing its office and warehouse) was not part of the deal. At this point, the transaction did not contemplate that Fahey would remain in the beer distribution business. Rather, as Larkin testified at deposition, he was considering the possibility of a different business, one unrelated to the alcoholic beverages industry.

When Fahey's twenty suppliers were notified that Larkin intended to sell the business and that he sought their consent to the assignment of Fahey's distribution rights to Commercial, all except Heineken consented.[4] During the last week of April, 1999, Heineken sent written notice to Fahey withholding its

---

[4]The record does not contain a copy of Fahey's distribution contract with Heineken (assuming a written agreement exists), but it is undisputed that, whatever the terms of the agreement, it did not include a provision allowing Heineken to withhold its consent to the assignment of Fahey's distribution rights.

consent. Thereafter, the Fahey-Commercial deal was modified by an additional agreement pursuant to which Fahey promised to stay in business for the purpose of purchasing beer from Heineken and selling the beer to Commercial "at laid in cost with Commercial making payment to Fahey for such purchases within 25 days of Heineken billing Fahey." We understand the term "laid in cost" to mean Fahey passed on to Commercial the cost of purchasing the beverages from Heineken without deriving a profit.[5]

The transaction closed on May 3, 1999. All of Fahey's salespeople, two of its truck drivers, and its warehouse manager, David Tetreault, went to work for Commercial, and all of Fahey's delivery trucks were sold to a third party.

As of May 3, 1999, those placing telephone calls to Fahey were connected to an answering machine that played a recorded message informing callers that Fahey was closed, and told those wishing to place beer orders to contact Commercial. Callers wishing to speak to Fahey could leave a message and a telephone number where they could be reached. As stipulated by the parties, "Fahey shut down on Friday, April 30, 1999 and Commercial picked up on Monday, May 3, 1999, and started delivering."

Heineken discontinued sales to Fahey in May, 1999, without providing advance written notice to Fahey and the commission pursuant to § 25E. On June 2, 1999, Fahey applied to the commission for relief under § 25E. Following a pretrial conference, the commission issued an interim order requiring Heineken to resume shipment of its brand name products to Fahey pending the outcome of the proceedings.

On November 17, 1999, Heineken sent a letter to Fahey, in

---

[5]The parties have not defined "laid in cost." In the alcoholic beverages industry the concept appears to refer to the price posted by the brand owner plus additional costs, which could include the cost of delivery (i.e., freight costs), see *M. H. Gordon & Son* v. *Alcoholic Bevs. Control Commn.*, 14 Mass. App. Ct. 973, 974 (1982), and state and local taxes, see *National Distrib. Co.* v. *United States Treasury Dept.*, 626 F.2d 997, 1002 n.23 (D.C. Cir. 1980) (also noting that " '[l]aid-in cost' does not include capital expenses or profit"). It does not appear on the record whether freight costs here are those incurred by shipping to Fahey, transshipping to Commercial, or something else.

62 Mass. App. Ct. 567 (2004)       571

Heineken U.S.A., Inc. *v.* Alcoholic Beverages Control Commission.

which it notified Fahey of its intent to discontinue sales effective 120 days from Fahey's receipt of the notice; the notice also asserted that it had good cause to discontinue sales and, as required by the statute, set forth the specific grounds for discontinuance.[6]

The commission concluded after hearing (1) that Heineken's unilateral decision to terminate sales to Fahey was not warranted on the facts and Heineken was not exempt from providing notice to Fahey under § 25E; and (2) that the notice dated November 17, 1999, did not cure Heineken's failure to give notice prior to its attempt to terminate sales in May, 1999, and that the commission therefore did not need to consider the merits of Heineken's claim that Heineken had good cause for termination under § 25E.

*Standard of review.* Our review is governed by G. L. c. 30A, § 14. See *Van Munching Co.* v. *Alcoholic Bevs. Control Commn.*, 41 Mass. App. Ct. 308, 309 (1996). In conducting our review, we defer to the commission's findings of fact, see *Olde Towne Liquor Store, Inc.* v. *Alcoholic Bevs. Control Commn.*, 372 Mass. 152, 154 (1977), giving due weight to the commission's experience, technical competence, and specialized knowledge, as well as to the discretionary authority conferred upon it. See G. L. c. 30A, § 14(7). We will uphold the commis-

---

[6]Section 25E requires that "[t]he notice of discontinuance of sale . . . shall state the specific grounds for such discontinuance," and provides that the five possible good cause grounds "be limited to the following conduct:

"(*a*) disparagement of the product so as to impair the reputation of the brand owner or the brand name of any product,

"(*b*) unfair preferment in sales effort for brand items of a competitor,

"(*c*) failure to exercise best efforts in promoting the sale of any brand item,

"(*d*) engaging in improper or proscribed trade practices, or

"(*e*) failure to comply with the terms of sale agreed upon between supplier and wholesaler."

G. L. c. 138, § 25E, inserted by St. 1971, c. 833. Heineken's notice identified paragraphs (*c*) and (*e*) as its grounds for discontinuance of sale.

572                        62 Mass. App. Ct. 567 (2004)

Heineken U.S.A., Inc. *v.* Alcoholic Beverages Control Commission.

sion's decision if there is substantial evidence to support it. See *Seagram Distil. Co.* v. *Alcoholic Bevs. Control Commn.*, 401 Mass. 713, 721 (1988). "Judicial inquiry under the substantial evidence test is limited to determination of whether, within the record developed before the administrative agency, there is such evidence as a reasonable mind might accept as adequate to support the agency's conclusion." *Ibid.*

The commission's construction of the "good cause" provision of § 25E "is entitled to this court's deference." *Id.* at 718. We need not, however, extend deference to a decision that is based upon an error of law. See *Service Employees Intl. Union, AFL-CIO, Local 509* v. *Labor Relations Commn.*, 431 Mass. 710, 713 (2000); *BAA Mass., Inc.* v. *Alcoholic Bevs. Control Commn.*, 49 Mass. App. Ct. 839, 842 (2000). See also G. L. c. 30A, § 14(7)(*c*). Ultimate responsibility for interpreting the governing statute is for the courts. See *M. H. Gordon & Son, Inc.* v. *Alcoholic Bevs. Control Commn.*, 371 Mass. 584, 588-589 (1976).

*Discussion.* 1. *Notice requirement under § 25E.* Section 25E is protectionist legislation designed, at least in part, to redress the perceived economic imbalance between suppliers and wholesalers by preventing suppliers from arbitrarily terminating sales to wholesalers. See *Seagram Distil. Co.* v. *Alcoholic Bevs. Control Commn.*, 401 Mass. at 716-717. With this backdrop, we consider Heineken's contention that it was exempt from the notice requirements of § 25E.

The commission rejected Heineken's claim that Fahey had ceased operations, and instead found that in May, 1999, Fahey held a wholesaler's license under G. L. c. 138, § 18, ordered brand items from Heineken, held those items in its warehouse located at its principal place of business, timely paid Heineken for its purchases, and sold them to another licensed wholesaler (an act, referred to as transshipping, that is not per se prohibited by § 25E, see *Somerset Importers, Ltd.* v. *Alcoholic Bevs. Control Commn.*, 28 Mass. App. Ct. 381, 387 [1990]). The commission made the ultimate finding that, "while suspicions may have been present, Heineken had insufficient information on which to conclude rationally and fairly that Fahey had ceased to operate as a licensed wholesaler" in May, 1999.

These findings do not appear to be disputed and are supported by substantial evidence. Although Fahey apparently informed all of its suppliers that it was selling its business to Commercial, at the time Heineken refused to ship, Fahey remained in the alcoholic beverages business, albeit in a limited capacity, buying Heineken products and transshipping the products to Commercial. A telephone call to the commission would have confirmed that Fahey continued to hold a valid wholesaler's license. To the extent that Heineken relied upon Fahey's recorded telephone message as justification for cutting off shipments, there is no evidence that Heineken followed up with Fahey to determine the actual status of its business, or that it had inquired of the commission to determine whether Fahey still held a wholesaler's license. Until July 1, 1999, office and warehouse personnel were available to answer calls to Fahey, and nothing in the record suggests that beer deliveries were made to an empty warehouse. When Fahey continued to place orders for Heineken brand products, Heineken knew or should have known that Fahey had not ceased operations.

Heineken's contention on appeal is, in substance, that despite the fact that Fahey remained in business to this limited extent, Fahey's operation lacked economic substance and was instead a sham designed solely to prevent Heineken's ability to refuse to sell to Commercial. We need not, in the context of the present appeal, resolve the question whether the Fahey-Commercial arrangement was a sham, or if it was, whether that would constitute good cause to support discontinuance of sale. Those questions should, in the first instance, be addressed by the commission.

It is undisputed that Heineken had made regular sales of its brand items to Fahey "during a period of six months preceding any refusal to sell," and that Fahey was at all relevant times a "licensed wholesaler" within the meaning of the statute. G. L. c. 138, § 25E. The statute provides that a manufacturer and supplier such as Heineken "shall forward a notice in writing to the wholesaler, to whom it has sold any brand item, prior to discontinuing sales to such wholesaler of such brand item." G. L. c. 138, § 25E, inserted by St. 1971, c. 833. See *Sullivan* v. *Brookline*, 435 Mass. 353, 360 (2001) (interpreting "shall" as

mandatory).[7] Under the plain language and manifest purpose of the statute, see *Shamban* v. *Masidlover*, 429 Mass. 50, 54 (1999) (statutory language must be given effect consistent with its plain meaning unless the interpretation would be contrary to the intent of the Legislature), Heineken was required to give notice to Fahey.

While we think that a supplier should not be required to leave its products on the steps of a boarded-up warehouse when an operation has ceased to exist, these were not the circumstances facing Heineken here.[8] A supplier harboring doubts about the legal and operating status of a wholesaling business to which it owes a duty under § 25E is not without remedy, short of a unilateral cessation of sales. We agree with the commission that the question whether the circumstances warranted discontinuance of sale should be determined by the commission. It was Heineken's obligation to provide the written discontinuance notice required by § 25E and to seek commission review of the matter. Allowing a supplier like Heineken to make unilateral decisions about a wholesaler's right to notice would defeat the equalizing purpose of the statute. The commission's determination that Heineken was required to give a written notice to

---

[7]The second paragraph of § 25E provides in pertinent part:

"Any [supplier] . . . *shall* forward a notice in writing to the wholesaler, to whom it has sold any brand item, prior to discontinuing sales to such wholesaler of such brand item and *shall* forward a copy of said notice to the commission. The notice of discontinuance of sale *shall* be furnished by the [supplier] . . . to the wholesaler being discontinued at least one hundred and twenty days before the effective date of such discontinuance." (Emphasis supplied.)

G. L. c. 138, § 18E, inserted by St. 1971, c. 833.

[8]Where a business is truly defunct, the notice provisions may well not be applicable, as § 25E specifically applies to licensed wholesalers. See G. L. c. 138, § 25E. The statutory scheme authorizes the commission, after notice and a hearing, to cancel a license if the licensee ceases to conduct a licensed business. See G. L. c. 138, § 77. See, e.g., *BAA Mass., Inc.* v. *Alcoholic Bevs. Control Commn.*, 49 Mass. App. Ct. at 847-848 (where package store license held by BAA Massachusetts was revoked in part on evidence that it kept no inventory or implements of sale of alcoholic beverages; that licensed site was used as storage for another business; and that although shipments of alcoholic beverages stopped at its licensed location, they were not inspected or unloaded at that point, and a BAA Massachusetts employee merely signed for deliveries and sent them to their next destination).

Fahey, a licensed wholesaler, prior to discontinuing sales in May, 1999, was not error of law.[9]

*2. Determination of good cause.* By a letter dated November 17, 1999 — more than five months after Fahey filed its June 2, 1999, application for relief, and six months after it had first attempted to stop selling beer to Fahey — Heineken notified Fahey that it planned to discontinue sales to Fahey 120 days from the date of the letter and that it had good cause to do so. The letter specified the following grounds for the claim: (1) Fahey's failure to exercise best efforts in promoting the sale of Heineken's brand items, G. L. c. 138, § 25E(*c*); and (2) Fahey's failure to comply with the terms of sale between Fahey and Heineken, G. L. c. 138, § 25E(*e*). See note 6, *supra.*

Neither Fahey nor the commission has directed us to any rule, regulation, or statute that precludes the giving of notice under § 25E in the circumstances of this case.[10] Cf. *Union Liquors Co.* v. *Alcoholic Bevs. Control Commn.*, 11 Mass. App. Ct. 936, 937-938 (1981) (where commission found original notice to be technically deficient, "any notice deficiency was cured" by subsequent notice). While we agree that the late-filed notice did not in this case avoid the determination of a violation of the § 25E notice requirements as to the attempted termination of Fahey as its wholesaler in May, 1999, there is nothing in the record to support the commission's conclusion that the November notice was an attempt on Heineken's part

---

[9]Because the motion judge's sole reason for dismissing the c. 93A claim was that Heineken had not violated § 25E, and we agree with the commission that Heineken did indeed violate § 25E, that claim must be addressed on remand.

[10]Indeed, in *Pastene Wine & Spirits Co.* v. *Oak Ridge Vineyards*, ABCC decision No. 25E-1090 (February 25, 1993), the commission determined that a supplier's "good cause claims . . . should have [been] raised during the first case," which involved an application for review by Pastene, the wholesaler, of Oak Ridge's cessation of sales. In that case, as was the case here, Oak Ridge had argued that no notice was required because Pastene "no longer exist[ed] for purposes of section 25E." *Ibid.* (referring to *Pastene Wine & Spirits Co.* v. *Oak Ridge Vineyards*, ABCC decision No. 25E-1076 [September 30, 1992]). The commission also decided that, although good cause should have been raised in the first case, this "does not preclude Oak Ridge, if the facts warrant, from filing a good cause termination proceeding based on a cause of action arising after" the date of the hearing in the first case. *Ibid.*

"to manufacture a tenable position over six (6) months after the pending 25E proceeding was underway," in order to circumvent the notice requirements of § 25E.

Fahey had originally informed Heineken that it was selling its entire beer business. Once Fahey learned that Heineken would not accept Commercial as its wholesaler, however, Fahey changed its plans and altered the transaction so that Fahey would remain in business and Heineken would remain obligated by § 25E to continue to sell beer to Fahey that would ultimately be distributed by Commercial.[11] If Fahey had sold its entire business, as it had originally planned, Heineken would have been under no obligation to transact business with Commercial; had it chosen to do so, the notice provisions of § 25E would not have applied for six months. Our courts have recognized that a supplier may have legitimate business reasons to evaluate "prospective wholesalers for the six-month trial period provided by the Legislature in § 25E." *Heublein* v. *Capital Distrib. Co.*, 434 Mass. 698, 704 & n.12 (2001). See *Union Liquors Co.* v. *Alcoholic Bevs. Control Commn.*, *supra* at 938 ("Persons in a highly sensitive, closely scrutinized business [such as the liquor business] have need to know about and appraise the persons behind corporations with whom they are doing business"). Section 25E was not intended to generate inequities against suppliers. See *Pastene Wine & Spirits Co.* v. *Alcoholic Bevs. Control Commn.*, 401 Mass. 612, 619 (1988).

Once Heineken learned that Fahey had not, as it was first informed, ceased to do business, it was entitled to explore the nature of the evolving Fahey-Commercial relationship and, based upon the information acquired through discovery, to bring new grounds for discontinuance of sale before the commission

---

[11]The record reflects that the arrangement was initially manifested as follows: Commercial obtained Heineken products by placing an order with Suzanne Oparowski, Fahey's part-time bookkeeper; using Heineken's software system, Oparowski in turn submitted the order directly to Heineken; Heineken delivered the beer to Fahey's warehouse where Tetreault (formerly employed by Fahey but, since the closing, by Commercial) unloaded the container with one of Fahey's forklifts; Commercial's delivery trucks picked up the beer from Fahey's warehouse.

By the time of the hearing, the Fahey-Commercial arrangement had altered again and under the terms of a joint venture agreement it appears that the beer would no longer be warehoused with Fahey before going to Commercial.

for disposition.[12] Contrast *Union Liquors Co.* v. *Alcoholic Bevs. Control Commn.*, 11 Mass. App. Ct. at 937-938. Had the commission rendered its decision on Fahey's June, 1999, application for relief prior to the date of the November, 1999, notice, the commission would have been required to consider the issue at a subsequent, separate hearing. Section 25E allows either party to appeal to the commission for a hearing on the notice of discontinuance. It also requires the commission to "make a determination after hearing on the issue of good cause for discontinuance." *Id.* at 937, quoting from G. L. c. 138, § 25E.

Here, the hearing did not take place until May 2, 2000, and Fahey thus had nearly five months to prepare a defense to the allegations contained in the letter. The good cause issues were expressly submitted as contested issues of law in the parties' joint prehearing memorandum and were fully argued at the hearing on May 2, 2000. Although commenting on the lateness of the letter, Fahey's attorney never objected to consideration by the commission of the good cause issues. In the circumstances, the two applications were, in effect, consolidated for hearing (a procedural consequence that does not appear to be precluded by any rule or statute and which would have served the aims of efficiency and cost-effectiveness), and Heineken was entitled to a determination on the merits of its claims. See *Seagram Distil. Co.* v. *Alcoholic Bevs. Control Commn.*, 401 Mass. at 718 (the commission is charged with interpreting and enforcing the good cause provision of § 25E).

We remand this matter to the commission for a determination whether Heineken had good cause under § 25E to terminate its

---

[12]We note that, contrary to Fahey's assertions, *Somerset Importers, Ltd.* v. *Alcoholic Bevs. Control Commn.*, 28 Mass. App. Ct. at 387-388, does not answer the question of the propriety of the Fahey-Commercial arrangement. In that case, we held that a wholesaler's sales of brand products to a second wholesaler (its parent company) did not, without more, constitute good cause under § 25E for discontinuing the relationship. *Id.* at 387. The two wholesalers involved in that case were typical wholesaling operations. Here, in contrast, Fahey has only one supplier and its sole customer is the second wholesaler. *Somerset* leaves open the question whether the nature of the Fahey-Commercial transaction may constitute the additional component necessary to provide Heineken with good cause to discontinue sales.

relationship with Fahey as of November 17, 1999.[13] We think that the questions raised by Heineken's claim of good cause for discontinuation — including whether or in what circumstances a supplier may be bound to continue to sell its brand to a wholesaler who has ceased all business operations except transshipment to another wholesaler (with whom the supplier has never done, and does not want to do, business), or whether the Fahey operation was a sham lacking in economic substance, designed solely to evade Heineken's right to refuse sale to Commercial — are best left to the commission with its expertise and specialized knowledge of the highly regulated alcoholic beverages industry. See *Garfield* v. *Director of the Div. of Employment Security*, 377 Mass. 94, 96 (1979); *Beverages Intl., Ltd.* v. *Alcoholic Bevs. Control Commn.*, 24 Mass. App. Ct. 708, 711-712 (1987). See, e.g., *Pastene Wine & Spirits Co.* v. *Oak Ridge Vineyards*, ABCC No. 25E-1076 (September 30, 1992) (concluding there was "no evidence that the transaction is a sham").

*Conclusion.* The Superior Court judgment is vacated. A new judgment is to enter (1) affirming so much of the commission's decision that found that Heineken's failure to give notice prior to discontinuing sales to Fahey in May, 1999, violated the notice provisions of § 25E; and (2) remanding to the commission, for further findings and rulings consistent with this opinion, the good cause issues raised by Heineken's notice of November 17, 1999.

*So ordered.*

---

[13]The commission is authorized to make determinations on the good cause issue and "to grant such relief as may be appropriate under the circumstances." G. L. c. 138, § 25E, inserted by St. 1971, c. 833.